# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50484 | **DATE** | 12/6/2004 |
| **CASE TITLE** | | Page vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is remanded for further proceedings consistent with this opinion. Defendant's Motion for Summary Judgment is denied. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is granted in part and denied in part. The ALJ's determination as to Plaintiff's RFC determination is remanded for re-evaluation. The ALJ's Step Four past relevant work analysis is also remanded for additional findings, or in the alternative, the ALJ should proceed to Step Five.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | 12-8-04 | | |
| | Notified counsel by telephone. | | date docketed | | 21 |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 12/2/2004 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| AM | courtroom deputy's initials | | GG mailing deputy initials | | |

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| THERESE PAGE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 50484 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Therese Page ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§

405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for

Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").

42 U.S.C. § 416, 423.[1] This matter is before the Magistrate Judge pursuant to consents filed by

both parties on February 20, 2004. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for DIB on March 20, 2001 (Tr. 144), and her application for benefits was

denied on August 2, 2001. (Tr. 90). Plaintiff filed a request for reconsideration on October 17,

2001 (Tr. 97), and was subsequently denied reconsideration on November 27, 2001. (Tr. 98).

Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") on February

---

[1] Plaintiff also asserts that an application for Supplemental Security Income ("SSI"), pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1381(a), is at issue, but the court agrees with Defendant that this was an incorrect assertion.

5, 2002, but was initially denied the hearing due to a late filing date. (Tr. 104). However, by order of the Appeals Council on June 14, 2002, Plaintiff was granted a hearing before an ALJ. (Tr. 110). Plaintiff appeared, with counsel, before an ALJ on October 1, 2002. (Tr. 21). In a decision dated June 13, 2003, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 18-24). The Appeals Council denied Plaintiff's request for review, received on July 25, 2003, on September 17, 2003. (Tr. 9, 6).

## II. FACTS

Plaintiff was born on June 11, 1963, making her forty years old at the time of her October 1, 2002, hearing before the ALJ. (Tr. 144). Plaintiff completed high school and approximately one year's worth of college credits. (Tr. 34-35). At the time of her hearing, Plaintiff lived at home with her husband. (Tr. 32). Plaintiff claims disability since June 10, 2000, due to seizures, a back injury, depression, anxiety, and limited right hand mobility. (Tr. 10).

Plaintiff had no reported income since June, 2000. (Tr. 30). Plaintiff worked for Follett Library Resources as a picker from February, 2000, until June, 2000. (Tr. 165). Plaintiff worked full-time, pushing a cart and filling book orders. (Tr. 172). Plaintiff stated that she stopped working for Follett due to a surgery in July, 2000. (*Id.*).

Plaintiff worked at Huntley Supermarket from August, 1999, to January, 2000. (Tr. 165). Plaintiff worked in the deli, preparing food and washing dishes. (Tr. 171). This position required standing, walking, and handling of objects up to twenty-five pounds. (*Id.*). Plaintiff was paid seven dollars and fifty cents an hour for her services. (*Id.*). Plaintiff worked at Barnes & Noble from July, 1999, to October, 1999. (Tr. 165). Plaintiff worked various hours during the week, and was paid seven dollars per hour for her services. (Tr. 170). Plaintiff's main tasks

2

were filling shipping orders, store set-up, and some computer work. (*Id.*). Plaintiff was required to lift up to twenty pounds, walk, sit, stand, climb, stoop, kneel, crouch, and handle small and large objects while working at Barnes & Noble. (*Id.*).

Plaintiff also worked for Sedom Schools as a teacher's aide from September, 1997, to June, 1998. (Tr. 165). Plaintiff worked one on one with special needs children part-time and was paid six dollars and fifty cents per hour for her services. (Tr. 169). Plaintiff reported little lifting at this job, less than ten pounds. (*Id.*). From August, 1991, to approximately July, 1996, Plaintiff worked for Good Shepherd Hospital. (Tr. 165). There, Plaintiff worked in the mail room, which required pushing and pulling carts that weighed fifty pounds or more. (Tr. 168). Plaintiff worked full-time and was paid at a rate of eight dollars and sixty-five cents an hour. (*Id.*). Before 1988, Plaintiff's other work history included factory work at A.L.P., where Plaintiff inspected factory products and machinery. (Tr. 165). At this job, Plaintiff lifted up to twenty-five pounds frequently, and stood or walked for most of the day. (Tr. 166).

Plaintiff described her typical day since filing for disability as beginning with getting up in the morning and having a cup of coffee. (Tr. 50). Sometimes, however, Plaintiff stated that she would not feel like getting up, so she would either lay in bed or read. (*Id.*). Plaintiff stated she could read up to twenty pages at a time, depending on her concentration. (Tr. 50-51). Plaintiff used to volunteer for the county Clothing Closet, but gave up the activity due to her depression. (Tr. 50). Plaintiff stated that normal daily activities included cooking meals, cleaning the house, bathing and dressing herself, and occasionally grocery shopping. (Tr. 52). Plaintiff also stated that she could walk a couple of blocks around the neighborhood for exercise. (*Id.*). Plaintiff used to sew for fun, but stated she could no longer do this as a hobby. (Tr. 53). Additionally, Plaintiff stated that she did not like to be around lots of people so she avoids eating

3

out, going to the movies, and attending religious services. (*Id.*). Plaintiff did discuss a vacation to Las Vegas in December, 2001, with her husband at her hearing, but other than that, she stated she does not do much traveling or visiting. (Tr. 54-55).

At the time of Plaintiff's hearing, Plaintiff did not have a driver's license, so her husband or son drove her around when needed. (Tr. 34-35). Plaintiff's license was revoked by the state because of a DUI conviction. (Tr. 34). While Plaintiff may have been eligible to re-apply, Plaintiff stated that her doctor had recommended against it because of her seizures and medications. (*Id.*).

When questioned by the ALJ, Plaintiff reported that she did not think she could return to work because she did not want to be around people and because she sleeps all the time. (Tr. 36). Plaintiff also stated she was seeking psychiatric treatment with Family Services in McHenry, where she attends individual counseling once a week with a social worker. (Tr. 40, 44-45). It is not entirely clear in the record, but it appears that Plaintiff had an abusive first husband. (Tr. 40, 42). Plaintiff has also sought treatment and been hospitalized for her own chemical dependency. (Tr. 42). At her hearing, Plaintiff stated that she had been sober for three months. (Tr. 42).

Plaintiff testified about her seizures and other physical problems. She stated that she had not had a seizure in six to seven months prior to her hearing, but that her arthritis/bursitis still caused her to be achy in her left shoulder and spine. (Tr. 46). She also noted that her right arm, wrist, and fingers suffer from occasional numbness after twenty minutes of uninterrupted use. (Tr. 46, 58). Plaintiff reported that her carpal tunnel problems had been improved with surgery, but a little numbness remained and noted that her ring finger and pinkie didn't have mobility. (Tr. 39, 57).

Plaintiff also described an onset of depression, testifying that she continued to participate in individual counseling with a social worker due to her problems. (Tr. 40). Plaintiff testified that her depression makes her sad, unmotivated, and withdrawn. (Tr. 46-47). Plaintiff denied suicidal thoughts, but stated she did not trust people anymore since she was attacked in October, 1999, by an ex-boyfriend. (Tr. 48-49). Plaintiff stated she would have crying spells when she was nervous. (Tr. 47). Plaintiff also stated that her depression and medication made her sleepy. (Id.). She noted that she could sleep twelve to fourteen hours in a day a couple of times a week, and that other days, she would only sleep three hours, sometimes due to recurring nightmares. (Tr. 58-60).

At the time of Plaintiff's hearing, she took two prescription medications, including 120 milligrams of Phenobarbital a day for seizures and Remeron for depression. (Tr. 43, 61). Plaintiff maintained that her arthritis sometimes made her stiff, affecting her walking, standing, and sitting. (Tr. 49). Plaintiff testified that she could lift up to ten or twenty pounds. (Id.). She also stated that she could walk a couple of blocks. (Tr. 52).

Medical expert, Dr. Mark Oberlander, testifying before the ALJ, stated that the bulk of Plaintiff's medical evidence suggests mental impairments under Social Security listings 12.09, 12.08, 12.06, and 12.04. (Tr. 64). However, Dr. Oberlander took issue with Dr. Nelson's psychiatric evaluation of Plaintiff because Plaintiff denied any history of drug or alcohol abuse to Dr. Nelson, and also misrepresented the frequency of her seizures. (Tr. 65-66). Dr. Oberlander's own opinion, based on Plaintiff's mental health records and testimony, was that Plaintiff's restrictions on daily activities were mild, restrictions on social functioning and maintaining concentration/persistence/pace were moderate, and episodes of decompensation were none or one. (Tr. 67-68). Dr. Oberlander also stated that it was difficult to interpret

5

Plaintiff's mental record because Plaintiff's physical symptoms and alcohol/drug abuse were so interwoven. (Tr. 69-73). He opined that further psychological testing would be beneficial, such as a full battery of tests involving an assessment of cognitive functioning, personality functioning, and neuro-psych testing. (Tr. 73).

Vocational expert, Mr. James Radke, testifying before the ALJ, stated that Plaintiff's past work as a mail clerk and hand packer was classified as light and unskilled work. (Tr. 74). Mr. Radke found that Plaintiff's laborer of stores position was an unskilled position with a medium exertional level required. (*Id.*). Plaintiff's teacher's aide, deli counter, and bookstore jobs were classified as light and unskilled jobs. (*Id.*). Finally, Plaintiff's CNA position was classified as medium, semi-skilled work. (Tr. 74). The ALJ then asked Mr. Radke whether a hypothetical female, with the following characteristics, could perform Plaintiff's past work:

> 39 years old, has the work experience and education of this
> claimant and has the following exertional limitations, could sit for
> six hours, stand and walk for six hours, lift and carry frequently up
> to 10 pounds, occasionally up to 20 pounds. Assuming someone
> who could never climb any ladders, ropes, and scaffolds, and must
> avoid even moderate exposure to activities involving unprotected
> heights and being around moving and hazardous machinery.
> Further assuming someone who is limited to jobs that are simple or
> detailed, no complex, someone who is limited to jobs that are low
> to moderate stress, no high stress, and one who could primarily
> have no regular general public contact. Should work primarily
> alone. Being in proximity to coworkers being all right, but not
> having to interact with them to perform the work functions.

(Tr. 75).

Mr. Radke testified that such a hypothetical female could do Plaintiff's past jobs of hand packing and mail clerk. (Tr. 75). The Vocational Expert also stated that such a hypothetical female would be able to work as a messenger (8,900 jobs in the nine county northeastern Illinois area), maid (12,000 jobs), and library clerk (1,100 jobs). (Tr. 76). Plaintiff's attorney then

6

added a requirement to the ALJ's hypothetical whereby the worker could not use their non-dominant hand for over twenty minutes at a time. (Tr. 77). Mr. Radke indicated that such a requirement would exclude hand packing jobs, but would not affect the ability to do the mail clerk position. (*Id.*). Plaintiff's attorney then added Plaintiff's MRFC restrictions to the ALJ's hypothetical and inquired as to the effect. (Tr. 80). The Vocational Expert noted that such restrictions would not eliminate either the hand packing or the mail clerk jobs, but that it may put the mail clerk position in a "more questionable category." (Tr. 80). Finally, the attorney inquired about the allowable rate of absenteeism for the remaining jobs. (Tr. 48). Mr. Radke replied that ten to twelve days a year for illness would be a typical rate of absenteeism. (Tr. 85). The ALJ then closed Plaintiff's hearing, but allowed the record to remain open for twenty-one days in order to allow outstanding reports to be added. (Tr. 86).

### III. **MEDICAL HISTORY**

Plaintiff's earliest medical records before this court are treatment records which pre-date Plaintiff's alleged disability onset date of June 12, 2000, by several years. The first of these records are CT head scan results from August 18, 1982, and October 3, 1988. (Tr. 210-11). Plaintiff's 1988 CT revealed an area of hypodensity in the left temporal parietal region with no resulting mass effect. (Tr. 210). The test was otherwise normal. (*Id.*). Plaintiff's 1988 CT brain scan also showed a low-density lesion on the left parietal lobe. (Tr. 211).

On June 2, 1989, Plaintiff visited the Rockford Regional Perinatal Center for a meeting with Dr. George Hoganson and his associate, Gina Morley, M.S. (Tr. 212-14). Plaintiff's visit was spurred by concerns related to exposure to anti-convulsant medications during a pregnancy. (Tr. 212). At this meeting, Plaintiff stated that she had developed seizures at approximately nineteen years of age, which she treated with 400 mg of Dilantin daily. (Tr. 212). The doctors

informed Plaintiff that Dilantin was associated with a pattern of abnormalities in children exposed in-utero and discussed her options for prenatal diagnostic tests. (Tr. 213-14).

Plaintiff's records show that from May 17, 1999, through November 30, 2000, Plaintiff was provided counseling and advocacy services from Turning Point, a non-profit organization specializing in providing assistance to victims of domestic violence and sexual assault. (Tr. 232-277).

On October 13, 1999, Plaintiff was seen by Dr. Steven Rochell after she was assaulted with a knife, sustaining lacerations on her middle and ring fingers of her right hand. Dr. Rochell reported full tendon function and opined that she could return to work with limited use of her right hand. (Tr. 225). Plaintiff's emergency room records after her assault are also included in the record. (Tr. 226-30). The EMS report indicated that Plaintiff's laceration was across three fingers of the right hand and was approximately one quarter inch deep. (Tr. 230).

Plaintiff was examined by Dr. William Gatti, an Ears, Nose, and Throat specialist, on January 31, 2000, due to her nasal stuffiness. (Tr. 215). Dr. Gatti noted that Plaintiff had a past history of closed reduction of a nasal fracture and nasal polyp removal in 1991, and that she had a seizure disorder. (*Id.*). Plaintiff's exam revealed a somewhat diminished ability to communicate by hearing in the left ear resulting in difficulty hearing a whispered voice. (Tr. 215-16). Dr. Gatti also noted that Plaintiff had a deviated right nasal septum blocking approximately ninety percent of her airway. (Tr. 216). Plaintiff was diagnosed with chronic rhinitis, possibly allergic rhinitis, and was prescribed Allegra and Zithromax. (*Id.*). It was also recommended that Plaintiff undergo a septoplasty and an audiogram at a future date. (*Id.*).

Plaintiff visited the Beloit Clinic Department of Neurology on April 20, 2000, regarding her seizures. (Tr. 218). Dr. Merino noted that Plaintiff had not had any seizures for a very long time, but that she had recently been beat up by an old boyfriend, which Plaintiff reported caused her memory loss, poor concentration, and hearing loss in her left ear. (*Id.*). Dr. Merino also noted an injury to the ulnar supplied fingers of Plaintiff's right hand,[2] and also other cuts and bruises consequent to her fights. (*Id.*). Plaintiff complained of various things pertaining to stress, noting that she vomits when she gets nervous. (*Id.*). Plaintiff's neurological exam results reported normal recent and remote memory and normal attention span. (Tr. 218-19). Her cranial nerve exam showed normal results. (Tr. 219). Dr. Merino opined that Plaintiff's seizure disorder was under control with Phenobarbital and recommended an EEG and MRI due to her recent head trauma. (*Id.*). On May 3, 2000, Plaintiff underwent an MRI at Beloit Memorial Hospital. (Tr. 222). An enlargement of Plaintiff's left sylvian fissure was noted, possibly due to an arachnoid cyst or porencephaly due to a remote ischemic event. (*Id.*).

On April 1, 2000, Plaintiff was seen by an audiologist due to pressure in her ears. (Tr. 298). Plaintiff also reported tinnitus in her right ear for two months prior to her visit. (*Id.*). Plaintiff's tympanograms were normal, though her left ear had slight negative pressure. (*Id.*). Plaintiff was referred to a follow-up with Dr. Gatti. (*Id.*).

On August 2, 2000, Plaintiff was evaluated due to discomfort in her left wrist and right hand. (Tr. 224, 346). Upon examination by Dr. Steven Rochell, a one centimeter ganglion cyst was revealed on the volar aspect of Plaintiff's wrist. (*Id.*). Plaintiff's neurovascular status of the left upper extremity was reported intact, and she had a full range of motion of the left wrist. (*Id.*). Plaintiff also reported numbness affecting her right hand's fingers, but Dr. Rochell

---

[2]Plaintiff is left handed. (Tr. 224).

9

reported no signs of atrophy and stated that her Phalen test was negative. (*Id.*). Dr. Rochell opined that Plaintiff had ulnar neuropathy and recommended an EMG. (*Id.*).

Emergency physician records provided by Plaintiff for February 21, 2001, show that Plaintiff was seen after having two seizures at Memorial Medical Center. (Tr. 279). No injury was reported, nor where there any post-ictal symptoms. (*Id.*). The cause of Plaintiff's seizure was noted as recent alcohol intake. (*Id.*).

As a follow-up to her hospital visit, Plaintiff saw Dr. Merino on March 8, 2001. (Tr. 220). Dr. Merino opined that her seizures were under reasonably good control except for complaints of drowsiness, disorientation, and intolerance of bright lights due to the Phenobarbital. (*Id.*). Dr. Merino discussed alternative seizure medications with Plaintiff. (*Id.*). Plaintiff's neurological exam on the same date revealed normal results. (Tr. 289).

On May 8, 2001, Plaintiff underwent a CT scan of the brain with Dr. Richard Hammer. (Tr. 297). Dr. Hammer's impression was that there was no evidence of an acute abnormality, but that there were low density changes in the left parietal lobe, probably representing residual from an old brain contusion, stroke, or infectious lesion. (*Id.*).

Plaintiff visited Dr. Merino again on May 30, 2001, regarding her seizures. (Tr. 306). Plaintiff reported no seizures since her last visit and no problems with her medication. (*Id.*). Dr. Merino reported that Plaintiff's seizure disorder was stable, that her MRI of the cervical spine was normal, and that her CT brain scan remained "stably abnormal," showing an area of encephalomalacia, "which is old and probably the nidus of her seizure focus." (Tr. 307).

On the same day, Dr. Merino commented that he had been sent SSI forms to fill out regarding Plaintiff's seizures, back problems, and mental impairments. (*Id.*). He reported that

he was not the appropriate doctor to complete the form regarding back problems because he had not treated Plaintiff for those problems. (*Id.*). He also declined to complete the mental RFC as he had never seen any evidence of mental impairment of the Plaintiff or any psychiatric impairment beyond occasional situational depression. (*Id.*). Dr. Merino did, however, complete an epilepsy report and attempted to complete the spinal report at the request of the state disability examiners. (Tr. 299-305).

Dr. Merino's epilepsy report diagnosed Plaintiff with a seizure disorder, which had been treated with Phenobarbital since 1989. (Tr. 299). Dr. Merino noted no medication side effects. (*Id.*). The doctor also reported that Plaintiff's seizure episodes were nocturnal, resulting in loss of consciousness while sleeping. (*Id.*). Ability to do work related activities was limited to lifting under fifty pounds due to Plaintiff's size, but not due to her seizures. (*Id.*). No other work related restrictions were noted. (*Id.*). Dr. Merino's spinal disorder report diagnosed Plaintiff with chronic lower back pain and noted that Plaintiff could ambulate unassisted. (Tr. 301).

On June 14, 2001, Dr. Allan Nelson completed a psychiatric evaluation of Plaintiff for the Bureau of Disability Determination Services. (Tr. 308-10). Dr. Nelson noted that Plaintiff was mildly anxious during her examination and had some difficulties concentrating. (Tr. 309). Plaintiff's speech patterns tended to be circumstantial, but there were no signs of any formal thought disorders, hallucinations, delusions, or paranoid ideations. (*Id.*). Dr. Nelson noted that Plaintiff had mild deficits in memory and abstractive functioning, but stated that Plaintiff was able to remember specific details of the past twenty-four hours. (*Id.*). Dr. Nelson also discussed Plaintiff's seizures and her assault, noting that Plaintiff stated she had been anxious and depressed since the attack, with frequent flashbacks of the episode, difficulty concentrating, forgetfulness, insomnia and nightmares, and an irregular appetite. (Tr. 308). Plaintiff denied

suicidal ideation and history of drug or alcohol abuse, but stated she had fear of people following her or trying to harm her, and she had become particularly anxious around strangers. (Tr. 309). Dr. Nelson's diagnosis was post-traumatic stress disorder and his prognosis was recorded as "fair." (Tr. 310).

A state agency psychologist, Dr. Carl Hermsmeyer, completed a Psychiatric Review Technique form for Plaintiff on July 24, 2001. (Tr. 312-25). Dr. Hermsmeyer opined that Plaintiff had an affective disorder and anxiety related disorders that created a mild restriction on her daily living activities, a moderate restriction on her social functioning and her ability to maintain concentration/persistence/pace, and no episodes of decompensation. (Tr. 312, 322). Dr. Hermsmeyer characterized Plaintiff's affective disorder as depressive syndrome characterized by sleep disturbance and difficulty concentrating. (*Id*.). He characterized her anxiety disorder as recurrent and intrusive recollections of a traumatic experience with marked distress. (Tr. 315-17).

Dr. Hermsmeyer also completed a Mental Residual Functional Capacity Assessment ("MRFC") for Plaintiff on July 24, 2001. (Tr. 326-329). While Dr. Hermsmeyer found that Plaintiff was not significantly limited in her ability to socially interact or adapt, he did find that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. (Tr. 326-27). Dr. Hermsmeyer concluded that Plaintiff had the mental capacity to perform simple tasks. (Tr. 328).

Plaintiff was admitted to Memorial Medical Center after she had cut her right forearm with a razor on August 9, 2001. (Tr. 339). It is unclear from the record how Plaintiff sustained her injury, but Plaintiff denied suicidal ideation. (Tr. 339-40). Plaintiff was severely agitated in

12

the emergency room and hit staff, resulting in receiving an injection of Haldol. (Tr. 340).

Plaintiff was placed in an alcohol withdrawal protocol as well as individual, group, and family

counseling. (*Id.*). Plaintiff was also prescribed Remeron. Tr. 340). Her diagnosis was major

depression, alcohol dependence, seizure disorder, migraine headaches, mitral valve prolapse, and

a severe laceration over her right arm needing eighteen stitches. (*Id.*). Plaintiff's GAF was

recorded as 20. (*Id.*).

Plaintiff was evaluated by Dr. Atula Sharma, a psychiatrist, on September 5, 2001. (Tr.

350-52). Dr. Sharma noted that Plaintiff was anxious and depressed during her examination.

(*Id.*). Plaintiff reported that she had been involved in an altercation with her husband the day

before, and that her husband was in jail as a result. (*Id.*). No suicidal ideations were reported.

(Tr. 351). Plaintiff was diagnosed with recurrent major depression and a GAF of 40. (*Id.*).

Supportive therapy was recommended, but declined. (*Id.*). Plaintiff was encouraged to attend

AA meetings, and Dr. Sharma noted family therapy was needed, but also that Plaintiff's family

situation was very chaotic. (*Id.*). He also referred Plaintiff to Turning Point for anger

management and individual therapy. (*Id.*).

Plaintiff was seen by Drs. Ahmad and Saha on September 19, 2001, for abdominal pain.

(Tr. 332, 334). Plaintiff's examination revealed possible acute cholecystitis (inflammation of the

gallbladder), and a lapraoscopic cholecystectomy (surgical removal of the gallbladder) was

recommended. (Tr. 333). Dr. Saha did perform Plaintiff's lapraoscopic cholecystectomy

successfully on September 21, 2001. (Tr. 334-35).

On October 16th and 30th of 2001, Plaintiff was re-examined regarding problems with her

right arm. (Tr. 347, 365-66). Examining doctor, John Daniels, noted signs and symptoms of

carpal tunnel and cubital tunnel syndrome, although Plaintiff's electromyography was negative.

(*Id.*). Plaintiff expressed her wish to proceed with ulnar nerve transposition, as recommended by the examining physician and Drs. Rochell and Merino. (*Id.*). Plaintiff attended a pre-operation examination on November 15, 2001, and underwent a right cubital and carpal tunnel release and right ulnar nerve transposition on November 19, 2001. (Tr. 361, 363-64). Plaintiff tolerated the procedure well, and her December 3, 2001, and January 3, 2002, check-up reports stated that Plaintiff was doing very well with a full restoration of range of motion. (*Id.*).

Dr. C.F. Aquino, a state agency physician, completed a Residual Functional Capacity Assessment ("RFC") on July 26, 2001. (Tr. 353). Dr. Aquino reported that Plaintiff could occasionally lift/push/pull twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 354). Dr. Aquino noted that Plaintiff should never climb ladders, ropes, or scaffolds, or use hazardous machinery, but noted no other postural, manipulative, visual, or communicative limitations. (Tr. 355). Dr. Aquino opined that Plaintiff's seizures were not disabling and that her lower back pain did not affect her mobility. (Tr. 360). He also opined that Plaintiff retained the ability to perform unskilled light work. (*Id.*).

On April 4, 2002, Plaintiff began participating in family treatment services, and was referred for a substance abuse assessment, which she completed on April 25, 2002. (Tr. 370).[3] Through May and June of 2002, Plaintiff attended individual counseling sessions. (*Id.*). Plaintiff also completed an intensive outpatient program for chemical dependency issues, which she completed on September 5, 2002. (*Id.*). Plaintiff reported attendance of AA meetings three to four times a week. (*Id.*). Dr. Merino wrote a letter for Plaintiff on July 1, 2002, confirming

---

[3]Plaintiff's progress notes from Susan Kostner were submitted after her hearing before the ALJ.

that Plaintiff could participate in drug counseling, and that Plaintiff would need to remain on phenobarbital during this time to control her seizures. (Tr. 380).

On October 1, 2002, a doctor completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" for Plaintiff. (Tr. 367). No marked limitations in Plaintiff's ability to handle occupational, performance, or personal-social adjustments were noted, but Plaintiff was deemed to have slight to moderate difficulties in occupational, performance, and personal-social adjustments. (Tr. 367-69). No other comments were made on the form, and the doctor's signature was not legible. (Tr. 369).

## IV. **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalala*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[5] A severe impairment is one which significantly limits the claimant's physical or

---

[4] The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[5] The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security

18

Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

### A.  Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, the ALJ found that Plaintiff had not engaged in any substantial gainful activity after Plaintiff's alleged onset date. (Tr. 19). The finding of the ALJ as to Step One of the Analysis is not challenged by either party, and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

### B.  Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe

impairments, but the ALJ did not specifically list Plaintiff's impairments. (Tr. 19).

Nonetheless, this finding is not challenged by either party, and the court finds no reason to disturb it. Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. The ALJ's finding as to Step Two of the Analysis is affirmed.

## C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 19-20). In particular, the ALJ found that Plaintiff did not meet the requirements of Listing 1.04, vertebrogenic disorders, nor did Plaintiff's seizure disorder approach that described in the Listing of neurological disorders. (Tr. 19). The ALJ also concluded that Plaintiff's mental impairments did not satisfy the criteria of Listing 12.06, nor 12.04. (Tr. 19). In support of this finding, the ALJ stated that Plaintiff's affective disorder was not of the required duration, and further noted that the functional component of the "C" criteria of the Listings was not satisfied. (Tr. 20).

This court finds no error in the ALJ's analysis of the Listings, and neither party challenges the ALJ's finding under Step Three. As substantial evidence exists to support the ALJ's Step Three finding, this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

## D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is able to

perform her past relevant work because she retained the physical and mental residual functional

capacity to perform her past hand packing and mail clerk jobs based on the Vocational Expert's

testimony that such jobs were light and unskilled. (Tr. 22). Before doing so, the ALJ determined

Plaintiff's physical and mental residual functional capacity, ("RFC" and "MRFC" respectively).

The RFC is what the claimant can still do despite his or her physical limitations. *See* 20 C.F.R.

§416.945. In determining a Mental RFC ("MRFC"), the ALJ assesses the nature and the extent

of the Plaintiff's mental limitations and restrictions. 20 C.F.R. §416.945(c). In order to properly

assess an individual's level of functioning due to a mental disorder, evaluation of the impairment

must take into account the severity of the impairment over a period of time. 20 C.F.R. Ch III,

Part 404, Subpart P, Appendix 1 12.00(d). All of this information is then used to complete

Plaintiff's vocational assessment.

After considering the entire record, the ALJ found Plaintiff's RFC to preclude the

following work related activities:

> lifting more than 20 pounds occasionally or more than 10 pounds
> frequently; understanding, remembering and/or carrying out
> complex instructions; interacting effectively with the general
> public or co-workers on a regular basis; dealing effectively with
> more than moderate levels of stress; climbing ropes, ladders, or
> scaffolds; and performing jobs with more than moderate exposure
> to unprotected heights, or with or near dangerous moving
> machinery.

(Tr. 20). The ALJ reported that the objective findings in Plaintiff's medical history failed to

provide support for her allegations of disabling symptoms and limitations greater than those

listed above. (Tr. 20). In support of this statement, the ALJ noted that Plaintiff's seizure

disorder did not result in a regular occurrence of seizures, and that the overall impression based

on the reports of Dr. Merino was that the Plaintiff's seizures were under good control with her medication. (Tr. 20). Though Plaintiff reported complaints regarding her left wrist and right hand, the ALJ found that Plaintiff underwent a successful carpal and cubital tunnel surgery that provided Plaintiff a full range of motion. Likewise, the ALJ noted that according to Plaintiff's medical records, Plaintiff's pre-operation symptoms were considered "eliminated." (Tr. 21). The ALJ also discredited Plaintiff's complaints of back pain because no medical documentation regarding such an impairment was provided. (Id.).

The ALJ also commented on Plaintiff's "sudden psychiatric decline," noting that Plaintiff's mental state was normal through May 30, 2001, but dramatically deteriorated in June, 2001, when Plaintiff's psychiatric evaluation was completed for the Bureau of Disability Determination Services. (Id.). Rather than accepting Plaintiff's allegations that her symptoms of depression were disabling, the ALJ found that alcohol abuse was the primary cause of Plaintiff's depression and anxiety. (Id.). In support of this conclusion, the ALJ relied on the fact that Plaintiff's physician notes stated Plaintiff was drinking prior to her admission for a psychiatric hospital examination on August 9, 2001, and she had not theretofore demonstrated such severe symptoms of depression.

The ALJ acknowledged that her RFC was inconsistent with the opinion provided by Dr. Allan Nelson, but found that Dr. Nelson's opinion was not entitled to any special deference due to the fact the Dr. Nelson relied on the subjective reports of Plaintiff uncritically. The ALJ stated there were good reasons to question the reliability of Plaintiff's subjective complaints, especially given the fact that she denied, when presenting to Dr. Nelson, a history of drug and alcohol abuse that was prevalent in her record. (Tr. 22). In addition, the ALJ noted that Dr. Merino wrote that

22

he was unaware of any mental impairment of Plaintiff after caring for her for fifteen plus years. (*Id.*). Finally, the ALJ adopted the testimony of Dr. Mark Oberlander, medical expert at the hearing, as consistent with the above RFC and supported by the substantial weight of the evidence. (*Id.*).

The findings of the ALJ at Step Four of the Analysis are challenged by Plaintiff. Plaintiff urges three bases for reversal or, in the alternative, re-hearing. First, Plaintiff asserts that the ALJ wrongly determined her RFC. Second, Plaintiff argues that the ALJ erroneously determined that she could perform her past relevant work. Third, Plaintiff argues that the ALJ made an improper credibility assessment. Because the ALJ's credibility determination affects each of Plaintiff's arguments, it will be discussed first.

A.     **The ALJ's Credibility Assessment**

Plaintiff disputes the ALJ's credibility assessment of Plaintiff, citing the ALJ's failure to follow SSR 96-6p and SSR 96-7p. Plaintiff specifically asserts that the ALJ mistakenly found that she misrepresented her impairments to her doctors, and that the ALJ failed to adequately account for her symptoms of depression when the ALJ formulated her RFC. Because Plaintiff's testimony that her depression causes her to sleep all the time would have precluded full-time work according to the vocational expert's testimony, Plaintiff also argues that the ALJ failed to sufficiently explain whether she was accepting, rejecting, or ignoring her allegations.

Defendant, on the other hand, asserts that the ALJ's credibility determination was not based on a mistake, and is, in fact, fully explained and strongly supported by the record. In developing this argument, Defendant cites numerous instances of inconsistency between Plaintiff's testimony and her medical evidence, including the fact that Plaintiff was untruthful

when she told Dr. Nelson that she did not have a history of drug and alcohol abuse (Tr. 22, referring to Tr. 309), and the fact that Plaintiff alleges arthritis and bursitis, but fails to provide any treatment notes regarding such a condition. In addition, Defendant points to Plaintiff's doctors that stated her hand and wrist problems had been eliminated by surgery (Tr. 361), and Dr. Merino's statement that "from my knowledge of [Plaintiff] for the last 15 or 17 years she has never had a mental breakdown nor any sort of psychiatric impairment beyond occasional situational depression." (Tr. 22, *quoting* Tr. 306).

Generally, a court will only reverse an ALJ's credibility determination if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). However, in evaluating credibility, the ALJ must follow her own regulations, including SSR 96-7p, which lists relevant considerations for evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *See* SSR 96-7p. Thus, an ALJ's conclusion is afforded great deference so long as the court finds that the ALJ followed proper procedures in making his or her determination. Even so, administrative law opinions are subject to harmless error review, such that every technical violation of the SSR does not equate to an automatic reversal or remand. *See Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003).

In this case, the court finds that the ALJ's credibility determination was grounded in the record and adequately justified in her opinion. The ALJ did not randomly decide to discredit Plaintiff's complaints of disabling symptoms. Rather, the ALJ specifically stated that she did not find Plaintiff's subjective complaints entirely credible, and she discussed the reasons for her disbelief, including the lack of objective evidence supporting Plaintiff's complaints, Plaintiff's

24

own misrepresentation to Dr. Nelson, and Dr. Merino's comments that he was unaware of Plaintiff's mental impairments. (Tr. 22). A further reflection of the ALJ's diligence was her acknowledgment of the evidence which conflicted with her own findings, namely Dr. Nelson's report, which the ALJ explicitly addressed in her opinion by noting that other doctors also questioned Dr. Nelson's conclusions and that Plaintiff did not reveal her substance abuse problems to Dr. Nelson. (*Id.*).

Perhaps the most convincing reason why the ALJ's credibility determination should not be overturned is the methodical nature in which the ALJ addressed each of Plaintiff's alleged impairments individually, building a "logical bridge" to her ultimate conclusion that Plaintiff was not entirely credible. Beginning with Plaintiff's seizure disorder, the ALJ noted that the record showed that Plaintiff's seizures were under good control with medication. (Tr. 20). Next, the ALJ addressed Plaintiff's left wrist and right hand difficulties, noting that such problems were reported "eliminated" by carpal tunnel surgery. (Tr. 21). Regarding Plaintiff's mental impairments, the ALJ noted Plaintiff's "sudden psychiatric decline" and the records that suggested Plaintiff's primary cause of depression was her alcohol abuse. (*Id.*). Moreover, the ALJ noted that though Plaintiff alleged impairments due to back pain, there was no documentation provided. (*Id.*).

In addition to the evidence noted by the ALJ that casts doubt on the severity of each of Plaintiff's alleged impairments, the court notes that not one of Plaintiff's physicians ever indicated that Plaintiff is disabled. Plaintiff's own treating physician indicated in his RFC that Plaintiff is capable of working. In addition, the state agency physician found Plaintiff capable of work, as did the state agency psychologist. Given the ALJ's supported decision for finding

25

Plaintiff's complaints not entirely credible and Plaintiff's longitudinal medical record, this court finds the ALJ's conclusion that Plaintiff was not entirely credible to be reasonable and sufficiently explained. As such, the court finds no reason to reverse the ALJ's finding, nor to remand for a new credibility determination.

## B.    The ALJ's RFC Determination

Plaintiff also urges the court to reverse or remand the ALJ's decision because the ALJ's RFC does not address all of Plaintiff's alleged impairments. Specifically, Plaintiff argues that her RFC should further limit her climbing, balancing, stooping, kneeling, crouching, crawling, handling, fingering, and hearing based on the findings of Dr. Aquino and Plaintiff's subjective complaints. Plaintiff further argues that she is precluded mentally from performing even unskilled, low stress work due to her inability to be around others and due to her inability to concentrate and remember things, based on the findings of Dr. Allan Nelson, Dr. Hermsmeyer, and her GAF scores of twenty and forty, recorded August 9, 2001, and November 19, 2001.

Defendant contends that the ALJ's RFC finding is substantially supported by the record. Defendant also specifically addresses the alleged deficiencies in the ALJ's RFC raised by Plaintiff. First, Defendant argues that Plaintiff's RFC does not require any additional postural limitations beyond those noted by the ALJ because Plaintiff's record is devoid of medical documentation supporting a hearing limitation or a limitation due to a back impairment that would justify limiting climbing, balancing, kneeling, crouching, and crawling. Defendant further notes that Plaintiff's alleged manipulative limitations are unsupported because Plaintiff underwent a successful surgery that restored her full range of motion. Finally, Defendant claims that the ALJ sufficiently addressed Plaintiff's depression symptoms in her RFC by limiting

Plaintiff to work that did not require regular interaction with the public or co-workers. To the extent that Plaintiff argues that her depression precludes even unskilled, low stress work, Defendant states that the ALJ reasonably found that Plaintiff's more serious symptoms of depression appeared to be tied to her problems with alcohol rather than a mental impairment.

The court's own review of the record for substantial evidence supporting the ALJ's RFC determination reveals several factors in favor of the ALJ's decision. First, as stated in the above analysis of the ALJ's credibility determination, the subjective complaints of Plaintiff are largely contradicted by her medical record. Most of Plaintiff's medical reports are, in fact, consistent with the ALJ's RFC. For example, the medical expert at Plaintiff's hearing, Dr. Oberlander, opined that Plaintiff's restrictions on work related activities were mild to moderate, with most of her restrictions related to social functioning. Taking this into account, the ALJ carefully tailored her RFC to limit Plaintiff's need to work with others. The ALJ's RFC also comported with Plaintiff's treating physician's RFC, as Dr. Merino's only noted restriction was limiting Plaintiff to lifting less than fifty pounds. The ALJ restricted Plaintiff to jobs requiring lifting of less than twenty pounds occasionally. Dr. Hermsmeyer, a state agency psychologist, likewise offered an opinion consistent with the ALJ's RFC, as his report also only indicated mild to moderate mental restrictions on Plaintiff's work related activities. Dr. Hermsmeyer also concluded that Plaintiff had the mental capacity to perform simple tasks.

While Plaintiff argues that the ALJ's RFC is contradicted by the RFC of Dr. Aquino, a state agency physician, Plaintiff is mistaken. Dr. Aquino never found Plaintiff to be *frequently limited* in climbing, balancing, stooping, kneeling, crouching, and crawling as suggested in Plaintiff's brief. (Pl.'s Mem. Supp. Mot. Summ. J., p. 10). Rather, Dr. Aquino limited

climbing ladders, ropes, and scaffolds due to her seizures, and stated Plaintiff *could frequently* climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 355). Dr. Aquino also opined that Plaintiff could perform unskilled light work. (Tr. 360).

The only real potential problem with the ALJ's RFC relates to Plaintiff's complaints of pains in her wrist and hand. While Plaintiff apparently underwent a surgery that "eliminated" her symptoms of discomfort by January 3, 2002, the ALJ's opinion does not account for any symptoms that Plaintiff may have had prior to that date that may have rendered her disabled under the Act. As Plaintiff is claiming disability through the period of June 10, 2000, she may be entitled to benefits for a limited period of time before her surgery.

While the ALJ's RFC demonstrates a careful attentiveness to each of Plaintiff's symptoms and the specific stressors that aggravated her symptoms, it does not adequately consider Plaintiff's complaints of pain prior to her carpal tunnel surgery. From August 2, 2000, up to January 3, 2002, when Plaintiff's surgery was reported a success, Plaintiff experienced documented problems with her left wrist and right hand, which necessitated carpal tunnel surgery in the first place. Yet, the ALJ makes no separate RFC finding for Plaintiff prior to her surgery. Further, the ALJ gives no explanation for her failure to use separate RFC statements. It could be that the ALJ did not find Plaintiff's pre-operation symptoms severe enough to further limit her RFC, but this is a impossible to discern from the ALJ's opinion. Normally, this would not be enough in itself for a remand, but since the court remands this case in another part of this opinion, there is no reason not to have the ALJ clarify this issue. Thus, it is the finding of the court that the ALJ should determine the RFC statement for Plaintiff prior to her carpal tunnel surgery.

## C.    Plaintiff's Past Relevant Work

Plaintiff contends that *had* the ALJ accepted the testimony and advice of the medical and vocational experts present at Plaintiff's hearing, the ALJ would have found that Plaintiff could not return to past relevant work.  Specifically, Plaintiff states that the ALJ wrongly disregarded the more restrictive RFC statement of medical expert, Dr. Oberlander, and further argues that the ALJ disregarded the vocational expert testimony of Mr. Radke that would have precluded the mail clerk position and hand packing job as potential past relevant work.

Defendant, on the other hand, argues that Plaintiff mis-reads the ALJ's RFC and the hearing testimony of the medical and vocational experts.  Defendant asserts that the ALJ's RFC did encompass the restrictions testified to by the medical expert because Dr. Oberlander opined that Plaintiff had no "marked" limitations in any of the categories of the mental assessment form, only "moderate" limitations in her ability relating to co-workers, dealing with the public, interacting with supervisors, dealing with work stresses, maintaining concentration, understanding and carrying out complex job instructions, and relating predictably in social situations.  Defendant also notes that Dr. Oberlander stated that Plaintiff was only "slightly" limited in her ability to follow work rules, use judgement, function independently, understand and carry out detailed job instructions, and behave in a reliable and emotionally stable manner; and that  Dr. Oberlander found no limitations on Plaintiff's ability to understand and carry out simple instructions.  (Tr. 69).  Beyond defending the mental component of the ALJ's RFC, Defendant argues that the ALJ's physical RFC component left open the possibility of Plaintiff performing some types of light work.  Defendant points out that because the VE testified that the

hand packing and mail clerk jobs were light, unskilled positions, Plaintiff is incorrect in asserting that the vocational expert's testimony precluded the mail clerk and hand packing jobs.

In addition to the arguments raised in Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment, Plaintiff argues specifically for the first time in her Reply to Defendant's brief that the ALJ did not follow SSR 82-62 and SSR 82-61. In particular, Plaintiff asserts that the ALJ failed to address the specific duties and functions of Plaintiff's past work in order to compare them with her present physical and mental capacity. In support of this argument, Plaintiff cites the court to *Strittmatter v. Schweiker*, where the Seventh Circuit held "that an ALJ cannot describe a claimant's job in a generic way . . . and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work." *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991)(citing *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984)).

This court finds Plaintiff's past relevant work argument persuasive. At Step Four of the sequential disability determination analysis, the claimant bears the burden to establish entitlement to benefits by proving the existence of medically determinable impairments which preclude the performance of past relevant work. In the Seventh Circuit, however, it appears that the ALJ also has a duty at Step Four to fully develop the record[6] and to ascertain the demands of Plaintiff's past work in order to make an appropriate comparison with the Plaintiff's present physical capabilities to meet the demands. *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir.

---

[6]"Our court has emphasized that the administrative law judge's decision in disability cases must be 'based on consideration of all relevant evidence and the reasons for his conclusions must be stated in a manner sufficient to permit informed review.'" *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985)(citing *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir. 1984). "That there may have been sufficient evidence in the record to enable the ALJ to make such a determination is not enough. The opinion itself must reflect that the ALJ considered this evidence before reaching his decision." *Clark v. Bowen*, 1986 WL 13522, at * 3 (N.D. Ill., Nov. 24, 1986).

1984); *see also Nolen v. Sullivan*, 939 F.2d 516, 518-19 (7th Cir. 1991); *Dodd v. Shalala*, 46 F.3d 1133, 1994 WL 712598 (7th Cir. 1994); *Clark v. Bowen*, 1986 WL 13522, at *2-3 (N.D. Ill. Nov. 24, 1986); *Daniels v. Heckler*, 1986 WL 1839, at *3 (N.D. Ill. 1986).

According to the Social Security regulations codified at 20 C.F.R. §404.1560, the ALJ determines whether a claimant can do past relevant work by examining information about past work provided by the claimant or other persons who know about the claimant's work. In addition, the ALJ may use the services of a vocational expert or the "Dictionary of Occupational Titles." When a vocational expert is used, he or she will "offer relevant knowledge concerning the physical or mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. §404.1560.

SSR 82-61 was written to clarify the meaning of past relevant work and the Administration's policy on the basis for deciding when a claimant can return to past relevant work. SSR 82-61 rejected "finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification." Instead, SSR 82-61 stated that the proper policy was to use: 1) "the actual functional demands and job duties of a particular past relevant job; or 2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61.

In addition, SSR 82-62 states that "[p]ast work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required." SSR 82-62 goes on to emphasize that "every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." Further, SSR 82-62 provides that disability determinations that find a claimant can return to past relevant work must clearly show the specific evidence that leads the

31

ALJ to his or her conclusion. In particular, a "finding that an individual has the capacity to perform a past relevant job . . . must contain among the findings the following specific facts: 1) [a] finding of fact as to the individuals RFC[;] 2) [a] finding of fact as to the physical and mental demands of the past job/occupation[; and] 3) [a] finding of fact that the individual's RFC would permit a return to his or her past job or occupation."

Recently, the Seventh Circuit affirmed its *Stritmatter* decision echoing SSR 82-61 and 82-62 in *Smith v. Barnhart*, No. 03-3498 slip op. (7th Cir. Oct. 26, 2004), finding that an ALJ's failure to consider whether a claimant could perform specific duties of jobs the claimant held in the past is an error of law justifying remand. Under *Smith*, the ALJ must also consider whether a claimant can perform the specific functional demands and job duties of the claimant's past occupation as generally required by employers throughout the national economy. *Smith v. Barnhart*, No. 03-3498 slip op. (7th Cir. Oct. 26, 2004)(citing *Orlando v. Heckler*, 776 F.2d 209, 215-16 (7th Cir. 1985). To determine if a claimant is capable of performing a particular job as it is ordinarily performed in the national economy, the ALJ can refer to the Dictionary of Occupational Titles ("DOT"). 20 C.F.R. §404.1566(d). *See also Steward v. Bowen*, 858 F.2d 1295,1301 (7th Cir. 1988).

Thus, in the Seventh Circuit, it appears that it is not enough for the ALJ to proffer a RFC to a vocational expert and rely on the expert's testimony that the RFC leaves open the possibility of a claimant performing a generic type of work (e.g., sedentary), and that the claimant can thus perform a former job that is classified at that level (e.g., assembly work). Instead, the ALJ must ascertain the specific job duties of past work in some detail, most likely through questioning the claimant, vocational expert, or referencing the DOT. Then, the ALJ should assess whether the

32

claimant can perform the specific duties given his or her limitations. Above and beyond this, the ALJ should also reference the specific duties in his or her determination opinion, so as to build a "logical bridge" to his or her ultimate conclusion. *See Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991)(finding that "the ALJ must specify the duties involved in a prior job and assess the claimant's ability to perform the specific tasks"). The court's reasoning behind this policy is well-founded. Not every job that falls into a particular category (e.g., sedentary) can necessarily be performed by a claimant as each will present unique exertional and non-exertional limitations. *See Daniels v. Heckler*, 1986 WL 1839, at *3 (N.D. Ill. Jan. 29, 1986).

Plaintiff's case demonstrates how even a careful and thorough ALJ can be lulled into accepting a vocational expert's testimony that a claimant can perform past relevant work. Here, Vocational Expert Radke testified that Plaintiff could perform "light, unskilled work" and thus "could perform some of the handpacking to most of the handpacking jobs in the region . . . [and] could perform [her] mail clerk position." (Tr. 75). In response to this statement at the hearing, the ALJ said, "Okay, so she could do those past work." (Tr. 76). During the ALJ's questioning, Mr. Radke did not cite the DOT or discuss the job duties of hand packing or mail clerk jobs, but stated that they were "not high stress positions even though there is a production requirement involved with handpacking." (Tr. 75).

On cross examination of the vocational expert, Plaintiff's attorney brought out some additional information about Plaintiff's past work. Mr. Radke testified that Plaintiff's non-postal mail clerk position required sorting things and putting carts in motion to get things where they need to go. (Tr. 78). Mr. Radke opined that one would not need bilateral manual dexterity to perform the sorting, but that it would require up to two hours continuous sorting. (*Id.*).

33

Describing Plaintiff's hand packing job, Mr. Radke stated that the work was "a quick repetitive situation and it isn't a quality control issue as, as much as putting products into boxes. . . . the use of both hands is going to be a, a frequent requirement and that would, meaning up to 66 percent of the day for a packing job." (Tr. 81).

The ALJ's entire discussion of Plaintiff's past work in her opinion was the adoption of Mr. Radke's statement that the requirements of the mail clerk and hand packing jobs were consistent with the exertional and non-exertional limitations of Plaintiff's RFC, and the repetition of Mr. Radke's statement that his testimony was not inconsistent with the DOT. (Tr. 23). The ALJ's "Findings" section further concluded that "claimant's past relevant work, as hand packer and mail clerk, did not require the performance of work-related activities precluded by the residual functional capacity limitations reported above." (Tr. 23). This was the only information contained in the ALJ's opinion pertaining to Plaintiff's past work history.

Hand packing and mail clerk jobs may indeed be classified as light, unskilled work, but such a job description is the "broad range of physical and mental abilities description" that SSR 82-62 and SSR 82-61 policy seeks to avoid. The ALJ never stated what a mail clerk or hand packer does, so it is unclear if the ALJ made the individualized comparison of Plaintiff's past relevant work and her exertional and non-exertional capabilities as is required in the Seventh Circuit.

In fact, a review of the record in this case reveals facts contrary to the ALJ's decision that Plaintiff can return to her past relevant work. For example, Plaintiff's job history information shows that Plaintiff was required to lift up to fifty pounds at her past mail clerk job (Tr. 168), and up to twenty pounds frequently at her hand packing job. (Tr. 166). Yet, even though Plaintiff's

34

RFC limited Plaintiff to lifting no more than twenty pounds occasionally and ten pounds frequently, the ALJ found Plaintiff could return to these prior jobs. (Tr. 20). Had the ALJ followed SSR 82-62 and SSR 82-61, she would have likely discovered this discrepancy between the vocational expert's testimony, Plaintiff's specific past work duties, and her own RFC.

Even then, Plaintiff's burden is not met by showing she cannot return to her past work as she performed it. Plaintiff must also show that she cannot return to past work as it is performed in the national economy. However, in the Seventh Circuit, the ALJ also has the corresponding duty to make an appropriate comparison between Plaintiff's capabilities and the job requirements of Plaintiff's past jobs as they exist in the national economy. To complete this task, the ALJ would typically reference the DOT or question the vocational expert. In the instant case, the ALJ's only reference to the DOT is her repetition of the vocational expert's statement that his testimony did not conflict with the DOT.[7] There is also no description of job duties in the ALJ's

---

[7]Though not cited by the vocational expert or in the ALJ's opinion, the DOT does describe mail clerk and hand packaging jobs as:

**209.687-026 MAIL CLERK (clerical):**
Sorts incoming mail for distribution and dispatches outgoing mail: Opens envelopes by hand or machine. Stamps date and time of receipt on incoming mail. Sorts mail according to destination and type, such as returned letters, adjustments, bills, orders, and payments. Readdresses undeliverable mail bearing incomplete or incorrect address. Examines outgoing mail for appearance and seals envelopes by hand or machine. Stamps outgoing mail by hand or with postage meter. May fold letters or circulars and insert in envelopes [FOLDING-MACHINE OPERATOR (clerical) 208.685-014]. May distribute and collect mail. May weigh mail to determine that postage is correct. May keep record of registered mail. May address mail, using addressing machine [ADDRESSING-MACHINE OPERATOR (clerical) 208.582-010]. May be designated according to type of mail handled as Mail Clerk, Bills (clerical).
*GOE: 07.05.04 STRENGTH: L GED: R3 M1 L2 SVP: 2 DLU: 87*

**920.587-018 PACKAGER, HAND (any industry):**
Packages materials and products manually, performing any combination of following duties: Cleans packaging containers. Lines and pads crates and assembles cartons. Obtains and sorts product. Wraps protective material around product. Starts, stops, and regulates speed of

opinion (or anywhere in the record ) that would show that the ALJ considered whether the requirements of being a hand packager or a mail clerk are consistent with Plaintiff's residual functional capacity.

Absent any discussion about the requirements of these past jobs as they exist in the national economy, it is not possible for the court to determine if the ALJ properly determined whether Plaintiff has the residual functional capacity to perform her past relevant work. It may be that remand in this case is futile because the vocational expert also testified about other jobs

---

conveyor. Inserts or pours product into containers or fills containers from spout or chute. Weighs containers and adjusts quantity. Nails, glues, or closes and seals containers. Labels containers, container tags, or products. Sorts bundles or filled containers. Packs special arrangements or selections of product. Inspects materials, products, and containers at each step of packaging process. Records information, such as weight, time, and date packaged. May stack, separate, count, pack, wrap, and weigh bakery products and be designated Bakery Worker (bakery products). May apply preservative to aircraft and spaceship parts, package parts for shipment, and be designated Wrapper and Preserver (aircraft mfg.). May be designated according to whether high-production or small-lot packaging as Fancy Packer (retail trade; wholesale tr.); Packaging-Line Attendant (any industry); specific packaging duty performed as filling, wrapping, packing, labeling, and container cleaning as Sack Sewer, Hand (any industry); kinds of equipment used or product packaged as Candle Wrapper (fabrication, nec); Carton Stapler (any industry); or whether packager performs associated duties as final assembly before packaging product as Novelty-Balloon Assembler And Packer (rubber goods). May weigh and package meat in retail store and be designated Meat Wrapper (retail trade). May be designated: Bagger (any industry); Bow Maker, Gift Wrapping (any industry); Box Maker, Cardboard (any industry); Box Wrapper (any industry); Bundler (any industry); Candy Packer (sugar & conf.); Caser, Rolled Glass (glass mfg.); Coil Strapper (steel & rel.); Container Filler (any industry); Filler (any industry); Furniture Packer (retail trade); Grader, Sausage And Wiener (meat products); Guncotton Packer (chemical); Inserter, Promotional Item (any industry); Inspector-Packager (any industry); Lidder (any industry); Mattress Packer (furniture); Packager, Meat (meat products); Packer, Dried Beef (meat products); Packer, Foamed-In-Place (any industry); Packer, Sausage And Wiener (meat products); Piece-Goods Packer (textile); Scaler, Sliced Bacon (meat products); Sponge Packer (wholesale tr.); Stamper (any industry); Table Worker (any industry); Tube Packer (rubber tire); Wrapper (any industry); Wrapper, Hand (can. & preserv.); Wrapping Remover (any industry). Workers who tend packaging machines are classified under PACKAGER, MACHINE (any industry) 920.685-078.
*GOE: 06.04.38 STRENGTH: M GED: R2 M1 L1 SVP: 2 DLU: 88.*

existing in the economy that Plaintiff could perform, such as messenger, maid, and library clerk. (Tr. 76). However, the ALJ did not further explore these possibilities with the vocational expert or include them in the findings of her opinion, nor did she proceed to Step Five, as she would have been required to do had she found Plaintiff incapable of resuming her past relevant work. *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004). Therefore, on remand, the ALJ must make additional findings relevant to a Step Four determination with due attention to the requirements of SSR 82-62 and SSR 82-61, or the ALJ may find that Plaintiff cannot perform her past work and proceed to Step Five.

## VII. CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is remanded for further proceedings consistent with this opinion. Defendant's Motion for Summary Judgment is denied. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is granted in part and denied in part. The ALJ's determination as to Plaintiff's RFC determination is remanded for re-evaluation. The ALJ's Step Four past relevant work analysis is also remanded for additional findings, or in the alternative, the ALJ should proceed to Step Five.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 12/6/04